IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

P.S. and C.S., by their Guardians,        )
LINDA NELSON and RANDALL NELSON,          )
                                          )
                 Plaintiffs,              )
                                          )
        v.                                )        Case No. 07-2210-JWL
                                          )
THE FARM, INC.,                           )
                                          )
                 Defendant.               )
                                          )
_____  )

## MEMORANDUM AND ORDER

In this diversity action, two minor children assert negligence claims under Kansas law against defendant The Farm, Inc. ("TFI"), a private foster care placement company, arising out of the alleged sexual and physical abuse of plaintiffs by the adopted teenage son of foster parents with whom TFI placed plaintiffs. The case presently comes before the Court on plaintiffs' and TFI's respective motions to exclude expert testimony (Doc. ## 273, 284); TFI's six separate summary judgment motions (Doc. ## 269, 271, 279, 282, 286, 288); and TFI's motions to strike certain factual statements submitted by plaintiffs in opposition to summary judgment (Doc. ## 350, 354). For the reasons set forth herein, the Court rules as follows: Plaintiffs' motion to exclude the expert testimony of Scott Fraser is granted; the remaining expert motions are denied. TFI's fourth motion for summary judgment, relating to plaintiffs' claims of wanton conduct and outrage and their claims for punitive damages, is granted, and judgment is entered

in favor of TFI on those claims; TFI's remaining summary judgment motions are denied.

TFI's motions to strike are denied.

## I.    **Background**[1]

Plaintiff P.S., a male, was born in 1996; his sister, plaintiff C.S., was born in

1997.  Plaintiffs presently reside in Texas with their legal guardians, Linda and Randall

Nelson (plaintiffs' biological grandmother and her husband).

TFI is a not-for-profit corporation located in Kansas.  In 1997, TFI began

contracting with the Kansas Department of Social and Rehabilitation Services ("SRS")

to provide foster care and reintegration services to Children in Need of Care in SRS

custody.  TFI's responsibilities included accepting foster children for placement;

maintaining licensing files on foster parents; assigning duties to caseworkers,

permanency social workers, permanency teams, and quality assurance teams; working

collaboratively with other agencies in promoting the safety of foster children in SRS

custody; and maintaining effective mechanisms for reviewing records and evaluating

client care, contractual compliance, licensing standards, and national accreditation

standards.

In February 2003, SRS removed plaintiffs from the care of their biological parents

---

[1]Consistent with the applicable summary judgment standards, *see infra* Part IV,
these facts are the subject of the parties' stipulations or are related in the light most
favorable to plaintiffs.  Additional specific facts are discussed below in the context of
particular motions by TFI.

because of concerns about abuse and neglect.  On February 25, 2003, TFI commenced foster care services for plaintiffs pursuant to its contract with SRS.  On February 27, 2003, TFI placed plaintiffs in the home of Roy and Janet Bartram in Wyandotte County, Kansas.  The Bartrams were licensed foster parents with whom TFI had previously placed foster children.  Nathan Bartram, the then teenaged son of Roy and Janet Bartram, resided in the Bartram foster home during the time that plaintiffs resided there.  The Bartrams had adopted Nathan in 1994.

During plaintiffs' placement in the Bartram home, a Kansas state district court ordered that plaintiffs undergo a sexual abuse evaluation.  The evaluation was conducted by Dr. Lynn Sheets at the University of Kansas Medical Center on September 12, 2003. In her report, Dr. Sheets stated that neither plaintiff had disclosed any sexual abuse; that there were no strong suspicions of sexual abuse of C.S. at that time; and that P.S.'s behavior was suspicious for sexual abuse.  Dr. Sheet's report also noted that, when asked whether she had ever been hurt in a private area, C.S. initially responded "Nathan," although she later denied having been touched in a private place.  Dr. Sheets recommended that plaintiffs continue their ongoing mental health therapy treatments in order to facilitate the disclosure of any sexual abuse that plaintiffs may have suffered.

Plaintiffs remained in the Bartram foster home until March 5, 2004.  In July 2004, Linda and Randall Nelson were appointed plaintiffs' guardians.  After their removal, plaintiffs disclosed that they had been sexually abused by Nathan Bartram while they resided in the Bartram home.  Nathan subsequently pleaded guilty to and admitted the

sexual abuse of plaintiffs and the attempted murder of C.S. by the placement of a plastic bag over her head.

Plaintiffs P.S. and C.S., through their guardians, now assert claims of negligence and outrage against TFI under Kansas law, and they seek compensatory and punitive damages.  Plaintiffs generally allege that TFI was negligent in placing them in and not removing them from the Bartram home and in managing their foster care and providing services to them, resulting in injuries suffered from the sexual abuse and attempted murder.  Plaintiffs originally asserted claims also against Wyandot Center, where plaintiffs received mental health services, and the Bartrams, but those claims (as well as the claims between TFI and those parties) have been settled.

## II.    Plaintiffs' Motion to Exclude Expert Testimony (Doc. # 273)

Plaintiffs seek to exclude opinion testimony by TFI's experts Scott Fraser and Daniel Marble.

### A.    *Governing Standards*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court instructed that district courts are to perform a "gatekeeping" role concerning the admission of expert scientific testimony.  *See id.* at 589-93; *see also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999).  The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In order to determine that an expert's opinions are admissible, this Court must undertake a two-part analysis: first, the Court must determine that the witness is qualified by "knowledge, skill, experience, training, or education" to render the opinions; and second, the Court must determine "whether the witness' opinions are 'reliable' under the principles set forth" in *Daubert* and *Kumho Tire*. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). The rejection of expert testimony is the exception rather than the rule. *See* Fed. R. Evid. 702 advisory committee notes.

To qualify as an expert, the expert must possess such "knowledge, skill, experience, training, or education" in the particular field as to make it appear that his or her opinion would rest on substantial foundation and would tend to aid the trier of fact in its search for the truth. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004). In determining whether the proffered testimony is reliable, the Court assesses whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be properly applied to the facts in issue. *See Daubert*, 509 U.S. at 592-93. The *Daubert* Court listed four factors relevant to assessing reliability: (1) whether the theory has been tested; (2) whether the theory has

been subject to peer review and publication; (3) the known or potential rate of error associated with the theory; and (4) whether the theory has attained widespread or general acceptance. *Id*. at 592-94. In *Kumho Tire*, however, the Supreme Court emphasized that these four factors are not a "definitive checklist or test" and that a court's inquiry into reliability must be "tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150. In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than on the *Daubert* factors and scientific foundations. *Id.* (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)). The district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id*. at 152.

"The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). The proponent thus bears the burden of presenting necessary evidence or requesting an evidentiary hearing in opposition to a challenge to expert testimony. *See id.* at 1244, 1251.

>    B.    *Testimony by Scott Fraser*

TFI has designated Dr. Scott Fraser as an expert witness in this case. According to his expert report, Dr. Fraser evaluated information concerning the plaintiffs in light of "the best scientific knowledge about the diagnosis of child sexual abuse and the most reliable empirically-based predictors of true vs. false child sexual abuse allegations." He stated that "[e]xtensive scientific research has revealed common patterns of disclosure

in cases of actual child sexual abuse," and that the "degree to which the facts [regarding plaintiffs] match or deviate from these scientifically based norms is of obvious importance in judging the reliability of the claims by the alleged victims."  According to Dr. Fraser, "[t]he best, methodologically sound studies show that most sexually abused children readily disclose their experiences to friends or trusted adults upon direct inquiry with an average rate above 85%."  He concluded that plaintiffs' repeated denials and failure to disclose sexual abuse "simply are inconsistent with the scientific findings about disclosure patterns in cases with actual victims of child sexual abuse;" thus, "[s]cientifically, one must have great pause in judging the reliability of any sexual abuse allegations by either of these children [plaintiffs]."

Dr. Fraser also stated that "[s]cientific experiments, field investigations, and analyses of actual legal cases have produced a substantial body of findings indicating that how information is elicited from children can dramatically influence not only the responses of the children, but also the actual belief those children subsequently hold." Dr. Fraser noted that the questioning styles of the Wyandot Center, TFI's case workers, Dr. Sheets, Mrs. Bartram, and Linda Nelson "were not memorialized to allow a full analysis of the suggestiveness of those inquiry sessions with [plaintiffs]."  Nevertheless, Dr. Fraser proceeded to analyze the facts regarding plaintiffs against six separate "domains of evidence" or "predictors" that, according to "[d]ecades research [*sic*] with large sample sizes," "predict more reliably than clinical judgments whether an allegation of sexual abuse from a child is accurate."

With respect to the first predictor, "the quick onset of unusual mood and affect disorders," Dr. Fraser admitted that both plaintiffs had "documented occurrences of these types of affect disorders," but he noted that school records did not contain such evidence. With respect to the second predictor, he admitted that there was little clear evidence relating to plaintiffs concerning possible advantage or secondary gain from making an assertion of sexual abuse; nonetheless, he concluded that the eventual disclosure by one plaintiff may have been in compliance with a demand to tell about Nathan Bartram, which evidence may serve as an indicator of advantage. Third, Dr. Fraser concluded that evidence of embellishment by plaintiffs is "more likely the product of continued suggestive questioning and possible confabulation (for secondary gain) than the result of accurate memory of the original experience." Fourth, with respect to corroboration of plaintiffs' allegations, Dr. Fraser noted that the medical records were inconclusive, that there were no independent witnesses, and the context of the alleged abuses was such that there would not be "corroborative or refutational physical evidence." In evaluating this predictor, Dr. Fraser did not mention Nathan Bartram's conviction or admission of sexual abuse of plaintiffs. Fifth, Dr. Fraser concluded that there was insufficient data to assess whether the amount of details recalled by plaintiffs suggested a true or false accusation. Sixth, Dr. Fraser concluded that plaintiffs did not display the signs of developmental discontinuity that are characteristic of sexual abuse victims.

Plaintiffs do not challenge Dr. Fraser's qualifications, but instead raise various issues relating to the reliability of his opinions. The Court first rejects plaintiffs'

challenges based on Dr. Fraser's failure to define certain terms in his report and his rendering opinions on certain predictors despite the admitted lack of sufficient data. These concerns go to the weight to be given Dr. Fraser's testimony, not to its admissibility. The Court also rejects plaintiffs' argument that Dr. Fraser has impermissibly commented on the alleged victim's credibility. *See Hellums v. Williams*, 16 Fed. App'x 905, 910 (10th Cir. 2001) (experts may testify that an alleged victim suffers from symptoms consistent with sexual abuse, but may not comment on the victim's credibility, opine that abuse in fact occurred, or assume the fact of abuse). Although the issue is close, Dr. Fraser is careful not to opine on plaintiffs' credibility, and his testimony is more akin to a discussion of whether plaintiffs experienced various symptoms or signs consistent with actual abuse.

Plaintiffs more fruitfully argue that Dr. Fraser's opinions are not reliable in light of the *Daubert* factors. As plaintiffs note, Dr. Fraser repeatedly states in his report that his opinions are grounded in science and empirical studies. The report does not identify any relevant study or literature that supports those opinions or the application of the six predictors. Thus, plaintiffs argue that TFI has failed to show whether that method has been tested, whether it has been subject to peer review and publication, the known or potential rate of error of the method, or whether the method has attained widespread or general acceptance. *See Daubert*, 509 U.S. at 592-94.

TFI has not sufficiently answered this challenge by plaintiffs. In opposition to plaintiffs' motion, TFI has not offered any affidavit from Dr. Fraser or submitted any

evidence (or requested an evidentiary hearing) to support the reliability of his opinions. Instead, TFI responds that one may assume the reliability of Dr. Fraser's opinions from his qualifications, and it notes the report's statement that Dr. Fraser's method is based on decades of research.  In performing its gatekeeper role and assessing the reliability of Dr. Fraser's opinions, however, the Court cannot simply take Dr. Fraser's (unsworn) word for it; TFI bears the burden of establishing the necessary reliability and scientific validity of its experts' opinions, which necessarily entails the identification of particular studies or literature supporting those opinions.  TFI also insists that Dr. Fraser has not applied any scientific test that would make application of the *Daubert* factors appropriate, but in his report, Dr. Fraser consistently assures the reader that his opinions are consistent with scientific, empirical studies and research.  Therefore, *Daubert*'s factors are particularly apt here.  Finally, TFI argues that plaintiffs chose not to depose Dr. Fraser and that plaintiffs have failed to provide evidence that his method is *not* generally accepted or scientifically valid.  This argument fails, however, in light of TFI's own burden to present evidence to show the admissibility of its expert's testimony.

The Court concludes that TFI has failed to meet its burden with respect to the admissibility and reliability of Dr. Fraser's expert testimony.  TFI has not submitted *any* evidence to meet that burden; nor has it requested an evidentiary hearing at which such evidence might be presented.  Thus, in response to plaintiffs' challenge, TFI has not shown that Dr. Fraser's opinions concerning sexual abuse disclosure and his method of applying six discrete predictors concerning the veracity of allegations in this case

represent a valid, generally-accepted scientific approach, as he claims.  There is simply nothing to counter the possibility that Dr. Fraser simply made up these opinions and method from whole cloth.

Moreover, the need for some sort of scientific validation of Dr. Fraser's method and opinions is especially acute in light of his application of his method in this case.  For instance, despite Dr. Fraser's concession that at least two of his six predictors cannot properly be evaluated in this case, he seemingly attempted to apply them nonetheless. Although, as stated above, that fact in itself may not be enough to make his opinions inadmissible, it does at least raise the question of the scientific validity of his method and his application of it.  Similarly, Dr. Fraser attempted to apply the six predictors even after admitting that the suggestiveness of most of the questioning of plaintiff—a factor that can affect not only a child's answers, but the child's actual belief—could not be evaluated because of a lack of data.   Moreover, Dr. Fraser's entire enterprise—evaluating factors that may bear on whether plaintiffs were in fact abused—seems questionable in light of the eventual plea and admission by Nathan Bartram to the sexual abuse of plaintiffs, a fact ignored by Dr. Fraser.[2]  Again, that omission in itself may not be sufficient to render Dr. Fraser's opinions inadmissible; it does, however, heighten the need for evidence that Dr. Fraser has validly and reliably

_____

[2]The Court rejects TFI's suggestion that Dr. Fraser was purposefully considering only the evidence that TFI would have had at the time in evaluating the veracity of any disclosures of sexual abuse by plaintiffs.  Dr. Fraser's report was not so limited, but rather spoke in terms of whether or not such abuse of plaintiffs ever occurred.

applied a scientifically reliable and valid method.

Finally, the Court believes that the lack of scientific support for Dr. Fraser's method and opinions is especially troublesome in light of the report's clear attempts to steep its opinions in science and empiricism (including the use of a percentage in the report without supporting citation), as a jury might be more apt to lend credibility to such opinions; thus, there is a particular risk that plaintiffs would suffer unfair prejudice from the admission of opinions that have not been shown to be reliable.

In summary, TFI has not shown that Dr. Fraser's expert testimony is sufficiently reliable or scientifically valid.  Therefore, the Court grants plaintiffs' motion to exclude his expert testimony.

### C.   *Testimony by Daniel Marble*

Plaintiffs also move to exclude the expert testimony of Daniel Marble.  Mr. Marble submitted an expert report in which he opined that TFI met the applicable standard of care in its dealings with plaintiffs and rebutted certain opinions by plaintiffs' expert.  The Court rejects plaintiffs' challenges to Mr. Marble's testimony and denies plaintiffs' motion.

First, plaintiffs contend that Mr. Marble gained his experience and expertise in California, not Kansas, and that his report fails to include any opinion that the two states' foster care systems are comparable.  The Court rejects this argument.  Plaintiffs have not identified any authority requiring a Kansas expert here.  Plaintiffs have not challenged Mr. Marble's general qualifications as an expert in this field, and he based his opinion

12

on his review of Kansas regulations and policies.  Plaintiffs also argue that Mr. Marble's report fails to indicate that he reviewed TFI's own policies or its contract with the State of Kansas.  Mr. Marble's opinions, however, are sufficiently based on his expertise and his review of certain documents.  Whether he reviewed particular documents is fodder for plaintiffs' cross-examination at trial, as these concerns go to the weight of the testimony, not its admissibility.

Plaintiffs also challenge Mr. Marble's rebuttal of plaintiffs' expert's opinion warning against the placement of foster children in a home with male teenagers.  Mr. Marble noted that no data indicated that Nathan Bartram had been a victim of sexual abuse.  Plaintiffs argue that that opinion is now unreliable in light of later-produced documents revealing that Nathan did experience such abuse.  Again, however, such a concern goes only to the weight to be given the opinion at trial.  Moreover, it is not clear that Mr. Marble's opinion was based solely on that absence of data.  There is no basis to exclude this testimony at this time.

Finally, plaintiffs seek to exclude Mr. Marble's opinion that TFI "can not [*sic*] be held accountable for the alleged inadequacies" of another agency or actor.  Plaintiffs argue that this opinion impermissibly addresses the ultimate legal issue of whether TFI may be liable (accountable) for another party's negligence.  *See, e.g.*, *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998) ("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts.").

13

The Court rejects this argument for exclusion.  It is true that Mr. Marble may not testify that TFI cannot be held accountable legally for another's negligence.  It is not clear that Mr. Marble has expressed such an opinion in his report, however.  Rather, it appears that Mr. Marble is opining that, in this case, the fact that others may have acted inappropriately does not necessarily mean that TFI acted negligently.  Such an opinion would not be objectionable.  The eventual admissibility of Mr. Marble's opinion in this regard will turn on his actual testimony at trial.  There is no basis to exclude the opinion at this stage; accordingly, plaintiffs' motion to exclude testimony by Mr. Marble is denied.

### III.   TFI's Motion to Exclude Expert Testimony (Doc. # 284)

TFI seeks to exclude opinion testimony by plaintiffs' experts Wes Crenshaw and William Logan.

#### A.   *Testimony by Wes Crenshaw*

##### 1.   QUALIFICATIONS

Plaintiffs offer Dr. Wes Crenshaw as an expert witness to testify concerning whether TFI satisfied the applicable standard of care in its dealings with plaintiffs.  TFI first seeks to exclude such testimony on the basis that Dr. Crenshaw is  not sufficiently qualified as an expert to offer his particular opinions.  Specifically, TFI argues that while Dr. Crenshaw may be an expert with respect to the provision of mental health services and therapy to foster children or child victims of sexual abuse, he is not expert with

14

respect to the specific subject of a private foster care placement company's standard of care.  TFI notes in this regard that Dr. Crenshaw has never been employed or had experience strictly as a social worker or as a person with the responsibility for placing foster children.

The Court denies TFI's motion to exclude Dr. Crenshaw as unqualified.  Dr. Crenshaw's testimony reveals that he has been intimately involved in the foster care system, both as a therapist and as a foster parent.  He has had interactions with all participants in that system, including contractors like TFI.  He also has experience participating in discussions and analyses specifically relating to the placement of foster children.  In essence, TFI argues that an expert cannot be qualified if he has not been employed in the exact position occupied by the party, but the law is clearly not so strict (for instance, TFI's position would seem to exclude academics as experts).  Dr. Crenshaw has studied and has a great deal of experience within the foster care system, and the Court concludes that his opinions fall "within the reasonable confines of his subject area."  *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (as long as an expert stays "within the reasonable confines of his subject area," the lack of specialization affects the weight of the opinion and not its admissibility) (quoting *Compton v. Subaru of Am.*, 82 F.3d 1513, 1520 (10th Cir. 1996)).

2.   RELIABILITY AND FOUNDATION

TFI next argues that Dr. Crenshaw's opinions concerning TFI's placement of plaintiffs in the Bartram home are speculative and unfounded, and that he lacks the

expertise to offer those opinions.  The Court rejects this argument.  Dr. Crenshaw's opinions were permissibly based on his experience and his review of documents and the facts of this case.  As concluded above, Dr. Crenshaw possesses the necessary qualifications to render his expert opinions.

TFI focuses on an admission by Dr. Crenshaw in his report that "there are no validated practice standards in this area."  A review of the report, however, reveals that that statement related only to the specific opinion that young children should never be placed in a home with teens who have been in foster care or adopted after mistreatment.  Dr. Crenshaw specifically states that "considerable collateral data on child development" agrees with that opinion.  Moreover, Dr. Crenshaw testified in his deposition that there are accepted standards of care within the field of foster care management.  TFI's argument goes only to the weight of Dr. Crenshaw's specific opinion, not its admissibility.

TFI also takes issue with Dr. Crenshaw's opinion that TFI failed to ensure that plaintiffs received the proper services that would have facilitated their disclosure of sexual abuse.  TFI notes that Dr. Crenshaw's opinions focus on the failings of the Wyandot Center in providing mental health services to plaintiffs.  TFI argues that such opinions are irrelevant in light of the stipulation in the pretrial order that plaintiffs have released TFI from claims asserted in this case against Wyandot (who has settled with plaintiffs), "including allegations arising out of TFI's contractual relationship with Wyandot Center, and any claims relating to Wyandot Center's fault, including but not

16

limited to Wyandot Center's negligence, misconduct, intentional conduct, omissions or commissions, and contractual obligations."

The Court rejects this argument as well. Plaintiffs allege that TFI was negligent in performing its own duties, the performance of which was affected by other parties' actions and inactions. For instance, plaintiffs allege that while Wyandot was not providing proper care, TFI was negligent in failing to recognize that fact and in failing to provide the necessary care as needed. Such a claim is distinct from the claim (which has been released) that TFI is liable solely because Wyandot was negligent or breached a contract. Plaintiffs must still prove TFI's own breach of its standard of care, and Dr. Crenshaw's expert testimony regarding Wyandot's failings is relevant to that claim. Accordingly, the release noted in the pretrial order does not provide a basis to exclude Dr. Crenshaw's testimony.

Finally, TFI challenges Dr. Crenshaw's opinion that TFI failed to recognize certain warning signs that suggested abuse of plaintiffs. TFI argues that such opinion lacks foundation because TFI was not in fact aware of two of the disclosures by plaintiffs discussed by Dr. Crenshaw in his report's conclusion.

The Court rejects this basis for exclusion of Dr. Crenshaw's testimony. Dr. Crenshaw's opinion was not based solely on those two disclosures. Moreover, Dr. Crenshaw opined that TFI *should have known* about the disclosures; thus, TFI's actual knowledge or lack thereof does not necessarily make his opinion unfounded. TFI's argument concerning such details goes only to the weight of Dr. Crenshaw's opinion and

may be explored in cross-examination.  TFI's motion to exclude expert testimony by Dr. Crenshaw is denied.

### B. *Testimony by William Logan*

Plaintiffs' expert Dr. William Logan, a forensic psychiatrist, provided a report in which he concluded, based on his review of plaintiffs' treatment records, that plaintiffs are likely experiencing symptoms of post-traumatic stress disorder (PTSD).  Dr. Logan also offered opinions concerning plaintiffs' future treatment and the costs of such treatment.  TFI seeks to exclude Dr. Logan's testimony on the basis that his opinions lack sufficient foundation and are therefore speculative.  The Court denies TFI's motion.

First, TFI argues that Dr. Logan did not review enough documents, including the most recent treatment records.[3]  This argument does not provide a basis for exclusion here.  Dr. Logan's opinions are based on his review of treatment records and records concerning the abuse of plaintiffs, as well as his expertise and experience; therefore, Dr. Logan's opinions do not lack sufficient foundation.

TFI also argues that Dr. Logan's use of particular language, such as "likely", "can be", and words denoting mere possibility, demonstrates that his opinions are speculative.  In Kansas, although expert medical testimony cannot be speculative or conjectural, it is sufficient if the opinion is expressed in terms of probability as opposed to possibility; no

---

[3]TFI's repeated accusation that Dr. Logan reviewed only "six documents" appears intended to mislead the Court, as it is clear from Dr. Logan's report that he reviewed six sets or categories of documents, including multiple transcripts and the treatment records for both plaintiffs for a particular period of time.

particular words are required, and the court will not "indulge in semantic refinements" of the kind urged by TFI here. *See Nunez v. Wilson*, 211 Kan. 443, 446-48, 507 P.2d 329, 333-34 (1973); *see also Bearman v. Prudential Ins. Co. of Am.*, 186 F.2d 662, 665 & n.6 (10th Cir. 1951) (applying the same rule and noting that the rule has been applied in Kansas). The Court will not attempt to parse out the language of each opinion contained in Dr. Logan's report. Certainly, at trial his testimony will need to adhere to the probability standard; there is no basis to exclude his testimony at this time, however. The Court denies TFI's motion to exclude expert testimony.

### IV.    Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v.*

*Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## V.      TFI's Motions to Strike (Doc. ## 350, 354)

TFI moves to strike the statements of additional facts submitted by plaintiffs in opposition to TFI's third and fourth summary judgment motions.  TFI argues that those

statements violate D. Kan. Rule 56.1 governing summary judgment opposition briefs for a variety of reasons:  they comprise too many pages, and are therefore not concise; various paragraphs contain more than a singe factual statement; some citations to the record are not sufficiently specific, for instance by page number; and the statements contain new arguments and claims.  The Court rejects these arguments as a basis to strike the factual statements in their entirety.  The Court concludes in its discretion that plaintiffs' statements are sufficient to have permitted TFI to address them adequately in its reply brief, and that TFI has suffered little prejudice by any technical violation of the local rule.

TFI also argues that in many instances plaintiffs have relied on inadmissible evidence or cited to documents that are not authenticated by affidavit or deposition testimony.  Plaintiffs' response that their evidence need only be admissible is not well-taken.  *See Diaz*, 289 F.3d at 675 (evidence pertinent to a material issue of fact "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein"); *Guang Dong Light Headgear Factory Co. v. ACI Int'l*, 2008 WL 53665, at *3 (D. Kan. Jan. 2, 2008) (unauthenticated documents may not be considered on summary judgment) (quoting *In re Harris*, 209 B.R. 990, 996 (B.A.P. 10th Cir. 1997)).  The Court agrees with TFI that plaintiffs' statements include many references to documents that appear not to be properly supported by or incorporated in sworn testimony.  The Court declines to strike the entirety of plaintiffs' factual statements on this basis, and therefore it denies TFI's motions to strike.  In deciding TFI's various

summary judgment motions, however, the Court has not considered any statement of fact based solely on a document that has not been properly authenticated if TFI has specifically objected to that statement on this basis.[4]

### VI.   Qualified Immunity Under "Public Function" Doctrine (Doc. # 269)

In its first motion for summary judgment, TFI claims that it is protected from liability by qualified immunity applied through the "public function doctrine." TFI first cites *Perez v. Sugarman*, 499 F.2d 761 (2d Cir. 1974), in which the Second Circuit noted that under a "public function" theory, the actions of private entities may sometimes be considered to be infused with "state action" for purposes of determining whether a claim under 42 U.S.C. § 1983 involves conduct under color of state law, as that statute requires. *See id.* at 764-65. TFI then points to *Bartell v. Lohiser*, 215 F.3d 550 (6th Cir. 2000), in which the Sixth Circuit held that the qualified immunity that protects government officials from liability for civil damages may extend in some circumstances to private parties who may have acted under of color of state law for purposes of a claim under Section 1983. *See  id.* at 556-57. Finally, TFI relies on cases in which the Tenth Circuit has stated that private entities may assert qualified immunity in certain circumstances in defending against federal claims. *See DeVargas v. Mason & Hanger-*

---

[4]Although plaintiffs did not properly authenticate the police records concerning Nathan Bartram that they attached to their summary judgment oppositions, the Court takes judicial notice of his plea and sentencing proceedings.

*Silas Mason Co.*, 844 F.2d 714, 722-24 (10th Cir. 1988); *Warner v. Grand County*, 57

F.3d 962, 965 (10th Cir. 1995); *Rosewood Servs. v. Sunflower Diversified Servs.*, 413

F.3d 1163, 1166 (10th Cir. 2005).

The Tenth Circuit cases cited by TFI do not refer to "public function immunity,"

but rather discuss the application of qualified immunity to private entities.  Thus, in this

motion, TFI essentially argues that it performed a governmental function in this case by

virtue of its relationship to SRS, and that it should therefore enjoy qualified immunity

from civil liability.

As plaintiffs note, however, under the governing Tenth Circuit law, qualified

immunity does not apply to claims asserted under state law:

> Qualified immunity does not, however, apply to the [plaintiffs'] [state law]
> malpractice claim.  *See Jenkins v. City of New York*, 478 F.3d 76, 86 (2d
> Cir. 2007) (stating that qualified immunity "protects an official from
> liability under *federal* causes of action but is not generally understood to
> protect officials from claims based on state law").

*Eidson v. Owens*, 515 F.3d 1139, 1145 (10th Cir. 2008); *see also Jenkins*, 478 F.3d at

86 n.7 (citing cases from the Fifth, Sixth, and Eleventh Circuits with similar holdings).

Thus, TFI cannot rely on qualified immunity in this case.[5]

In its reply brief, TFI attempts to argue that "public function immunity" does

apply to state-law claims by citing cases from Kansas and elsewhere relating to the

"public duty doctrine."  *See, e.g.*, *Kirk v. City of Shawnee*, 27 Kan. App. 2d 946, 950-53,

---

[5]In none of the cases cited by TFI in its original brief did the court apply qualified
immunity to a state-law claim.

10 P.3d 27, 30-32 (2000).  Whether or not the "public function doctrine" is "sometimes referred to as the public duty doctrine," as TFI asserts, the Court does not agree that the two names describe the same legal theory.  In its original brief, TFI clearly based its argument on qualified immunity.  The Tenth Circuit has defined that concept as follows: "Government officials performing discretionary functions enjoy qualified immunity from civil damage suits if their conduct did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Warner*, 57 F.3d at 963-64 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The "public duty doctrine" under Kansas law, on the other hand, has been described as follows:

> When a negligence claim is asserted against a government agency, the court must consider the so-called "public duty doctrine."  That doctrine establishes the general principle that a governmental agency owes duties to the public at large rather than to individuals.  Under this doctrine, the fact the government entity owes a legal duty to the public at large does not establish a basis for an individual to claim the agency owed a legal duty to him or her personally.  No duty exists unless the plaintiff establishes that the agency owed a special duty to the injured party.

*Kirk*, 27 Kan. App. 2d at 950, 10 P.3d at 30 (citations omitted).  Thus, the "public duty doctrine" under Kansas law is solely concerned with the existence of a legal duty, as required for negligence liability.

TFI asserts in its reply brief that this doctrine should also apply to it, by virtue of its relationship to the state agency, and that it therefore owed no legal duty to plaintiffs. This argument is quite distinct from its original argument that it enjoys the same qualified immunity that protects government officials from civil liability.  The fact that

TFI seeks in each case to extend a legal concept ordinarily applied to government actors to itself as a private entity, based on its relationship to the state agency, does not somehow merge the two distinct legal concepts into one.[6]

In its original brief, TFI clearly based its argument for summary judgment on Tenth Circuit cases in which the court considered the application of the defense of qualified immunity to non-governmental actors. TFI cited no cases applying Kansas state law in that brief. The Tenth Circuit has followed other circuits in holding that qualified immunity does not apply to state-law claims. Therefore, the Court denies TFI's motion for summary judgment based on qualified immunity or "public function immunity."

Nor will the Court consider a separate argument based on the public duty doctrine under Kansas law because TFI did not make this argument until it submitted its reply brief. *See, e.g.*, *U.S. Fire Ins. Co. v. Bunge N. Am., Inc.*, 2008 WL 3077074, at *9 n.7 (D. Kan. Aug. 4, 2008) (court will not consider argument raised for first time in reply brief) (citing *Minshall v. McGraw Hill Broadcasting Co.*, 323 F.3d 1273, 1288 (10th Cir.

---

[6]TFI's citation to *Houle v. Gadoury*, 1993 WL 853792 (R.I. Super. Ct. 1993), is unavailing. In attempting to blur the lines between the two legal concepts, TFI notes that the *Houle* court cited the Tenth Circuit's decision in *DeVargas* in applying the public duty doctrine to a state-law claim. *See id.* at *4 (citing *DeVargas*, 844 F.2d at 722-24). The *Houle* court (a state trial court) clearly misapprehended *DeVargas*, however—the Tenth Circuit certainly did not conclude that a corporation was entitled to qualified immunity "under the public duty doctrine," *Houle*, 1993 WL 853792, at *4, as the Tenth Circuit never mentioned such a doctrine in that opinion, *see DeVargas*, 844 F.2d at 721-24. The legal defense discussed by the Tenth Circuit in *DeVargas* and the defense referred to by Kansas courts as the "public duty doctrine" are distinct.

2003)).  It is true that TFI's original brief contained a citation to *Houle*, in which the court applied the public duty doctrine, but that citation came at the end of a string cite at the end of the brief.  TFI clearly based its argument in the original brief on cases involving the application of qualified immunity to private actors, and it did not cite a single case applying Kansas state law.  Thus, the *Houle* citation did not give plaintiffs reasonable notice that TFI was asserting the public duty doctrine under Kansas law as a defense, and the citation was not sufficient to allow TFI to argue that theory in its reply brief.

Accordingly, TFI's first motion for summary judgment is denied.

## VII.   Tort Claims Act Immunity as Employee of SRS (Doc. # 271)

In its second motion for summary judgment, TFI argues that it is protected from liability as a matter of law by K.S.A. § 75-6104(e).  That statute, part of the Kansas Tort Claims Act (KTCA), provides immunity to governmental entities or employees with respect to claims based on the exercise or performance of (or failure to exercise or perform) a discretionary function or duty.  *Id.*[7]  In their brief, plaintiffs have not disputed for purposes of summary judgment that the allegedly negligent acts of TFI would qualify as discretionary under this statute.  Accordingly, the only issue is whether TFI was acting

---

[7]This immunity does not protect an actor from liability for wanton conduct.  *See Barrett ex rel. Barrett v. Unified Sch. Dist. No. 259*, 272 Kan. 250, 264, 32 P.3d 1156, 1166-67 (2001).  Thus, this basis for summary judgment urged by TFI does not apply to plaintiffs' wantonness claim in this case.

as a governmental employee under the KTCA as a matter of law.

As defined in the KTCA, "employee" includes any person "acting on behalf or in service of a governmental entity in any official capacity," but does *not* include "any independent contractor under contract with a governmental entity" other than those particular independent contractors listed in the definition (none of which apply here). K.S.A. § 75-6102(d).  Kansas appellate courts have not offered any helpful test or analysis to determine whether a party is an employee or an independent contractor under this definition.  For instance, in *Bonewell v. City of Derby*, 236 Kan. 589, 693 P.2d 1179 (1985), cited by TFI, the court held that the Derby Jaycees were entitled to this immunity as an employee of the city as a matter of law with respect to injuries sustained during a softball game on a city field in a league organized by the Jaycees.  *See id.* at 593, 693 P.2d at 1182.  The court did not apply any particular test, but merely noted that the Jaycees did not lease or have exclusive use of the property and were not responsible for the maintenance of the field, but merely scheduled games and organized the recreational use of the field.  *See id.*

In *Mitzner ex rel. Bishop v. State*, 257 Kan. 258, 891 P.2d 435 (1995), the court did not apply the KTCA definition, but it noted the definition's exclusion of independent contractors in determining whether foster parents were independent contractors or employees of SRS for purposes of the vicarious liability of SRS.  *See id.* at 261-62, 891 P.2d at 438.  Thus, this Court deems it likely that the Kansas Supreme Court would apply its general rules for distinguishing between an employee and an independent contractor

for purposes of vicarious liability also in a case involving the same distinction under the KTCA.

The general test under Kansas law for distinguishing an independent contractor relationship from an employer-employee relationship is as follows:

> An independent contractor is defined as one who, in exercising an independent employment, contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the results or product of his work. The primary test used by the courts in determining whether the employer-employee relationship exists is whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished. It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor.

*Falls v. Scott*, 249 Kan. 54, 64, 815 P.2d 1104, 1112 (1991) (quoted in *Mitzner*, 257 Kan. at 261, 891 P.2d at 437). "Although the right of control test is the most important single consideration in determining the relationship, it is not exclusive—other relevant factors are also to be considered." *McDonnell v. Music Stand, Inc.*, 20 Kan. App. 2d 287, 291, 886 P.2d 895, 899 (1994). The factors set forth in the Restatement (Second) of Agency § 220(2) are also helpful in determining whether a party should be considered an employee. *See Brillhart v. Scheier*, 243 Kan. 591, 597, 758 P.2d 219, 223 (1988). These factors include:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;

> (b) whether or not the one employed is engaged in a distinct occupation or business;

28

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

Restatement § 220(2). "[G]enerally speaking, the question of whether an individual is an employee or an independent contractor is considered a question of fact for the jury or trier of facts." *Falls*, 249 Kan. at 64, 815 P.2d at 1112.

This Court applied these standards in the vicarious-liability context in *Lowe v. Surpas Resource Corp.*, 253 F. Supp. 2d 1209 (D. Kan. 2003), and *Hunter v. The Buckle, Inc.*, 488 F. Supp. 2d 1157 (D. Kan. 2007). In *Lowe*, the Court concluded as a matter of law that a debt collection agency was not an employee of the bank with whom it contracted, but was an independent contractor, based on the following facts: (1) the parties' agreement allowed the bank to review the agency's collection efforts, but it did not authorize the bank to exercise control over the manner in which the agency collected

debts; (2) the agency's business was dedicated to debt collection, and the bank employed the agency for those distinct services; (3) the bank did not provide office supplies or equipment under the agreement, did not assist the agency in hiring employees or monitor their work performance, and did not train or test those employees; (4) under the agreement, the agency was paid by the job and not by the hour; and (5) the parties believed they were creating an independent contractor relationship, as evidenced by an unambiguous provision in the agreement to that effect.  *See Lowe*, 253 F. Supp. 2d at 1232-33.  The court noted that either party could terminate the agreement and that the bank had great latitude to review the agency's collection activity, but it concluded that those facts did not suggest that the bank retained control over the agency sufficient to establish an agency relationship or "that could overcome the unambiguous intent of the contracting parties."  *See id.* at 1233.

In seeking a ruling that it was an employee of SRS as a matter of law, TFI relies on this Court's opinion in *Hunter*, which involved a claim that a mall owner was vicariously liable for the acts of the company that provided security for the mall.  *See Hunter*, 288 F. Supp. 2d at 1167-69.  In *Hunter*, however, the Court did *not* hold that the security company was an employee of the mall as a matter of law; rather, the Court held that the security company was not an independent contractor as a matter of law, and it denied summary judgment to the mall owner because of evidence from which a rational trier of fact could conclude that the owner had sufficient control over the security company to support vicarious liability as an employer.  *See id.*  The Court noted that,

although the parties' agreement explicitly purported to create an independent contractor relationship, the owner had control over many facets of the daily operations of mall security, such as the officers' hours and compensation; the requirement of specific duties, training, and instruction; the use of specific forms; reserving the right to approve regulations in the security company's handbook; supplying an on-premises office and most of the equipment; and the use of security for other jobs, such as delivering information to tenants. *See id.* at 1168-69.

In the present case, TFI argues that its contract with SRS demonstrates control by SRS over TFI's day-to-day operation sufficient to create an employer-employee relationship. For instance, TFI points out that the agreement set forth certain minimum qualifications for TFI employees in certain positions; mandated TFI's use of certain forms; required that TFI use certain approaches in recruiting and assessing foster families; granted SRS 24-hour access to TFI; required TFI to accept custody of a foster child within four hours of a referral by SRS; allowed SRS to approve changes in placements; and allowed SRS to request information from TFI.

After reviewing the contract between SRS and TFI, the Court rejects TFI's argument that it was an employee of SRS as a matter of law.[8] First, the Court notes that

---

[8]TFI has objected to various factual statements submitted by plaintiffs in opposition to this motion for summary judgment, and the Court agrees that plaintiffs failed to authenticate some of its exhibits with affidavits or deposition testimony, as required. *See supra* Part V. TFI has also noted that it lodged contemporaneous objections to certain deposition testimony cited by plaintiffs. The Court need not resolve
(continued...)

an unambiguous provision of the parties' contract demonstrates their intent that TFI was

not an employee of SRS but should be considered an independent contractor:

### 3.10 Independent Contractor

Both parties, in the performance of this contract, shall be acting in their individual capacity and not as agents, employees, partners, joint ventures or associates of one another. The employees or agents of one party shall not be construed to be the employees or agents of the other party for any purpose whatsoever.

Contractor [TFI] accepts full responsibility for payment of unemployment insurance, workers compensation and social security as well as all income tax deductions and any other taxes or payroll deductions required by law for its employees engaged in work authorized by this contract.

Under the contract, TFI assumed the responsibility for designing and implementing the

foster care programs, administering services to foster children, recruiting and assessing

foster parents, and placing children in foster homes. The contract did require certain

minimum qualifications for particular positions, certain standards for assessment of

parents, and acceptance of custody within four hours; but the contract did *not* allow SRS

to control the manner in which TFI performed its duties, on a day-to-day basis, within

those mutually-agreed confines. For instance, as plaintiffs note, the four-hour

requirement did not equate to control over TFI's scheduling, as that contractual

requirement bound SRS as well as TFI (i.e., SRS could not insist on a shorter time frame

---

[8](...continued)
such objections at this time, as it has not relied on any such facts for its decision. In fact, the Court concludes that the contract documents are sufficient by themselves to raise an issue of material fact concerning TFI's relationship to SRS.

absent modification of the contract).  SRS did retain some rights of oversight, in that SRS would receive reports and had to approve certain changes; the right to such oversight, however, did not grant SRS the right to control in a general sense the manner in which TFI performed its duties on a daily basis.  Nor has TFI argued that SRS in fact exercised greater control over its operations than that provided in the parties' contract.

Thus, the Court concludes that the agreement between SRS and TFI brings this case closer to the facts present in *Lowe* than those in *Hunter*,[9] as evidenced by the following:  the agreement here granted SRS oversight, but did not authorize SRS to control the manner in which TFI performed its duties; there is no evidence that TFI engages in any business other than as a private foster care agency; the contract did not provide that SRS would supply any equipment or premises for TFI; under the contract, TFI was not paid simply by the hour, but instead received compensation based on the number of children served by TFI; and an unambiguous contractual provision demonstrates that the parties believed that they were creating an independent contractor relationship.  *See Lowe*, 253 F. Supp. 2d at 1233.  TFI certainly has not presented facts sufficient to overcome this unambiguous intent of the parties to its contract as a matter law.

Accordingly, the Court cannot conclude as a matter of law that TFI was acting as an employee, as defined in the KTCA, under its contract with SRS, as a rational jury

---

[9]Of course, the Court's ruling in this case is also consistent with *Hunter*, in which the Court reserved this issue for the trier of fact.

could certainly conclude that TFI was acting as an independent contractor.  Therefore, the Court denies TFI's motion for summary judgment based on discretionary function immunity under the KTCA.[10]

### VIII.   Foreseeability (Doc. # 279)

In its third motion for summary judgment, TFI argues that the alleged abuse of plaintiffs by Nathan Bartram and their resulting injuries were not reasonably foreseeable as a matter of law.  TFI argues therefore that it had no duty to prevent or protect plaintiffs from such abuse.  TFI has failed to identify any authority supporting the imposition of a "reasonably foreseeable" requirement for the creation of a duty under Kansas law in this foster care context.  Accordingly, the Court denies TFI's motion for summary judgment as it pertains to the duty element of plaintiffs' negligence claims.

TFI relies primarily on *McConnell v. Lassen County, California*, 2007 WL 1931603 (E.D. Cal. June 28, 2007), in which the court ruled that the defendant did not owe the plaintiffs a duty regarding its placement of the plaintiffs in a foster home in which they were sexually molested.  *See id.*  The Court does not agree, however, that *McConnell* is a "bull's-eye" case directly on point here.  First, *McConnell* was decided under California law, *see id.*, and therefore it provides no guidance concerning the Kansas negligence law that governs the present case.  Second, the court in *McConnell*

---

[10]In denying TFI's motion, the Court need not decide whether TFI acted an independent contractor, and thus not an employee under the KTCA, as a matter of law.

did not consider foreseeability as a requirement for the existence of a duty under California law; rather, the court discussed the foreseeability of harm to the plaintiffs as one of eight factors to be considered and balanced in determining whether a duty existed. *See id.* at *23-26. Thus, the court was not simply determining whether any evidence existed concerning the issue of foreseeability at the summary judgment stage. Third, the court based its conclusion that the harm was not foreseeable on the particular facts of that case, which naturally differ from the facts present here. Accordingly, *McConnell* does not compel the conclusion that plaintiffs in this case must establish foreseeability as a requirement for the existence of a duty under Kansas law or that plaintiffs cannot make such a showing (assuming one is required) as a matter of law.

TFI's citation to *Cupples v. State*, 18 Kan. App. 2d 864, 861 P.2d 1360 (1993), is also not particularly helpful in the context of this case. In *Cupples*, the court considered the foreseeability of harm to the plaintiff inmate by another inmate, but it did so in the context of considering the application of Restatement (Second) of Torts § 320 (not at issue in the present case) for purposes of considering a claim under 42 U.S.C. § 1983 based on a violation of the Eighth Amendment's deliberate indifference standard (as opposed to a simple negligence claim). *See id.* Thus, *Cupples* cannot be read as imposing a foreseeability requirement for finding a duty under Kansas law in every negligence case.

The *Cupples* court cited *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993), for the proposition that a duty of care may arise if a party reasonably should

know that harm will likely result. *See Cupples*, 18 Kan. App. 2d at 879-80, 861 P.2d at 1372. In *Nero*, however, the court based its duty analysis on landowner-invitee premises liability law. *See Nero*, 253 Kan. at 583, 861 P.2d at 779. The court also noted in that context that the reasonable foreseeability of a risk of harm is generally a question for the trier of fact. *See id.*

TFI has not pointed to any authority that would require a showing of reasonable foreseeability of harm to plaintiffs before a duty may arise in this context under Kansas law. Accordingly, the court rejects TFI's motion for summary judgment on that basis.

Moreover, even if foreseeability must be shown here before a legal duty may be imposed on TFI for plaintiffs' negligence claim under Kansas law, the Court would conclude that the question is one of fact for the jury. TFI argues that there is no evidence that it had actual, contemporaneous knowledge that Nathan Bartram was abusing plaintiffs, but such a standard is far too narrow in light of plaintiffs' claims. Not only have plaintiffs alleged that TFI should not have placed them in the Bartram home given the presence of the teenaged adopted sons and prior complaints and concerns about the Bartrams, but they have also alleged that TFI should have recognized and acted on various warning signs during the placement, and thus was negligent in monitoring the placement.

Plaintiffs have submitted sufficient evidence from which a reasonable jury could infer that TFI should have recognized a risk of harm to plaintiffs at the Bartram home. Plaintiffs have submitted evidence to support the following facts: the Bartrams were the

36

subjects of many concerns and complaints about their provision of foster care prior to the placement of plaintiffs there, including allegations of sexual misconduct that were deemed unsubstantiated; plaintiffs engaged in behaviors suspicious for sexual abuse during their placement at the Bartrams; the evaluation of plaintiffs revealed a suspicion of sexual abuse of P.S. and also noted that C.S. identified Nathan Bartram as having hurt her in a private area; and the Wyandot therapist was highly suspicious that P.S. had been sexually abused at some time. Moreover, plaintiffs' expert, Dr. Crenshaw, opined that TFI should have recognized various warning signs pointing to a risk of harm to plaintiffs. Thus, the Court cannot conclude that harm to plaintiffs in the Bartram home was not reasonably foreseeable as a matter of law.[11]

TFI also frames its foreseeability argument as an issue of proximate cause. Specifically, TFI argues that any abuse of plaintiffs by Nathan Bartram is an intervening cause that cuts off its own liability to plaintiffs as a matter of law. In *Reynolds v. Kansas Department of Transportation*, 273 Kan. 261, 43 P.3d 799 (2002), the Kansas Supreme Court noted that proximate cause issues no longer arise in basic negligence cases: "With the adoption of comparative fault, Kansas has moved beyond the concept of proximate cause in negligence." *Id.* at 269, 43 P.3d at 804. The court further noted, citing the Kansas pattern jury instructions, that intervening causes may be recognized in extraordinary cases. *See id.* at 269-70, 43 P.3d at 805 (citing PIK 3d Civil § 104.03).

---

[11]In light of its ruling, the Court need not consider plaintiffs' citations to various Restatement sections or TFI's objections thereto.

The relevant pattern instruction provides as follows:

> If an injury arises from two distinct causes which are independent and unrelated, then the causes are not concurrent. Consideration then must be given to the question of whether the causal connection between the conduct of the party responsible for the first cause and the injury was broken by the intervention of a new, independent cause which acting alone would have been sufficient to have caused the injury. If so, the person responsible for the first cause would not be at fault. If, however, the intervening cause was foreseen or should reasonably have been foreseen by the person responsible for the first cause, then such person's conduct would be the cause of the injury, notwithstanding the intervening cause, and *(he) (she)* would be at fault.

PIK 4th Civil § 104.03. Thus, for an intervening cause to cut off liability for previous cause, the two causes must be independent and unrelated and the second cause cannot have been reasonably foreseeable.

The Court concludes that the facts of the present case are not so extraordinary that TFI is protected from liability by an intervening cause as a matter of law. For the same reasons set forth above with respect to the element of a legal duty, a rational jury could conclude from the evidence that the harm to plaintiffs was reasonably foreseeable. That jury could also reasonably find that the alleged abuse of plaintiffs was not independent from and unrelated to negligence by TFI in failing to recognize and act on signs warning of a likely risk of harm to plaintiffs.[12] Thus, TFI is not entitled to summary judgment on this basis.

Accordingly, the Court denies TFI's third motion for summary judgment.

---

[12]The Court need not decide at this time whether a reasonable jury could find that the two causes in this case are unrelated.

## IX.    **Wanton Conduct and Tort of Outrage (Doc. # 282)**

In its fourth motion for summary judgment, TFI seeks summary judgment on plaintiffs' claims of wanton conduct and outrage under Kansas law and their claims for punitive damages.

### A.    *Addition of Claims in the Pretrial Order*

TFI first argues that plaintiffs' wantonness and outrage claims should be dismissed because plaintiffs did not assert such claims in their complaints, but instead asserted them for the first time in the pretrial order.  The Court evaluates a plaintiff's attempt to add a new claim in the pretrial order under Fed. R. Civ. P. 15(a), which provides that leave to amend "shall be freely given when justice so requires."  *See Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (quoting Fed. R. Civ. P. 15(a)).  "The purpose of the rule is to provide litigants 'the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"  *Id.* (quoting *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982)).

TFI argues that plaintiffs should not be granted leave to add these claims in the pretrial order because it would suffer undue prejudice from the addition.  Whether the amendment would prejudice the nonmoving party is the most important factor for a court in deciding a motion to amend the pleadings.  *See id.* at 1207.

> Courts typically find prejudice only when the amendment unfairly affects the defendants in terms of preparing their defense to the amendment.  Most often, this occurs when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues.

*Id.* at 1208 (citation and internal quotation omitted).

The Court concludes that TFI has failed to show any real prejudice from plaintiffs' addition of these claims in the pretrial order. The new claims arise out of the same subject matter as that set forth in plaintiffs' complaints, and they do not raise significant new factual issues, as plaintiffs rely on the very same conduct by TFI to support all of their claims. TFI argues that it would suffer prejudice because it was not able to conduct discovery on the new claims, including the heightened element concerning the state of mind of TFI's employees, but it has not identified any particular depositions it would have taken or discovery requests it would have propounded. Nor did it seek leave to conduct additional discovery after the pretrial order was issued. Nor has TFI explained why it would need discovery concerning its own state of mind. Moreover, the Court notes that plaintiffs' complaints did assert claims for punitive damages, and TFI had ample opportunity during discovery to identify any basis for such claims.

Therefore, the Court in its discretion grants plaintiffs leave to assert their claims of wanton conduct and outrage in the pretrial order, and TFI's motion for summary judgment on this basis is denied.

### B.   *Wanton Conduct*

TFI seeks also summary judgment on plaintiffs' claim of wanton conduct on the

basis that the evidence does not support such a claim.[13]  The Kansas Supreme Court has

defined wanton conduct as follows:

> Wanton conduct is an act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act.  A wanton act is more than ordinary negligence but less than a willful act.  For an act to be wanton, the actor must realize the imminence of danger and recklessly disregard and be indifferent to the consequences of his or her act.  Wantonness refers to the mental attitude of the wrongdoer rather than a particular act of negligence.

> . . .

> In order for a plaintiff to prove wanton conduct, it is not necessary that the plaintiff's evidence establish a formal and direct intention to injure any particular person.  It is sufficient if the defendant evinced that degree of indifference to the rights of others which may justly be characterized as reckless.

> Recklessness is a stronger term than negligence.  To be reckless, conduct must be such as to show disregard of or indifference to consequences, under circumstances involving danger to life or safety of others.  The keys to a finding of wantonness are the knowledge of a dangerous condition and indifference to the consequences.

*Reeves v. Carlson*, 266 Kan. 310, 313-14, 969 P.2d 252, 256 (1998) (citations omitted).[14]

---

[13]TFI argues that a claim of wantonness is not a separate cause of action under Kansas law, but merely represents a level of negligence.  That fact is immaterial, however, as it would not compel the dismissal of plaintiffs' wantonness allegations as a basis for punitive damages.

[14]Moreover, to support an award of punitive damages, plaintiffs must prove wanton conduct by clear and convincing evidence.  *See Reeves*, 266 Kan. at 313, 969 P.2d at 255 (citing K.S.A. § 60-3702(c)). The "clear and convincing" standard applies at the summary judgment stage. *See North Tex. Prod. Credit Ass'n v. McCurtain County Nat'l Bank*, 222 F.3d 800, 813 (10th Cir. 2000).  A claim for punitive damages "survives a motion for summary judgment if a reasonable juror could find from the evidence that
(continued...)

Plaintiffs argue that TFI acted wantonly based on the following facts supported by evidence:  TFI did not perform its own in-depth screening or assessment of the Bartram home.  TFI placed plaintiffs with the Bartrams despite a history of complaints and concerns about their foster parenting and supervision.  TFI's employees working with plaintiffs' placement were inexperienced and did not conduct enough visits to the foster home.  TFI did not provide specific sexual abuse counseling for plaintiffs following Dr. Sheets's evaluations.  TFI did not even obtain a copy of Dr. Sheets's entire report until after plaintiffs had been removed from the Bartram home.[15]

The Court concludes that this evidence is not sufficient to create a question of material fact concerning whether TFI acted wantonly.  Plaintiffs' evidence supports a finding of negligence, but nothing more.  Plaintiffs have not provided evidence from which a jury could infer that TFI had knowledge or an appreciation of a danger of sexual

---

[14](...continued)
the defendant[] acted in a wanton manner by clear and convincing evidence." *Rios v. Bigler*, 847 F. Supp. 1538, 1548 (D. Kan. 1994) (citations omitted), *aff'd*, 67 F.3d 1543 (10th Cir. 1995).

[15]Plaintiffs also point to a November 2003 report by TFI to state officials in which TFI noted that there had been concerns about the Bartram foster home relating to a lack of supervision and sexual abuse.  Plaintiffs did not properly authenticate that document by reference to an affidavit or deposition testimony, however, and the Court therefore may not consider it for purposes of summary judgment. *See supra* Part V.  Moreover, the lack of any details concerning this notation in the report (for instance, whether it related to an unsubstantiated allegation of abuse prior to plaintiffs' placement or the mere fact of Dr. Sheets's evaluation or some other concern) severely limits the probative value of this evidence.  The Court concludes that, even if it could be considered, this evidence would not create an issue of fact on plaintiffs' wanton conduct and outrage claims.

abuse for plaintiffs at the Bartram home.  At most, plaintiffs' evidence shows that TFI *should have* appreciated a risk of abuse from various signs.  For instance, in her evaluations, Dr. Sheets could not conclude that any sexual abuse of plaintiffs had occurred.  TFI may have been negligent in not acting on the suspicions of possible abuse; but there is no evidence that TFI realized and then disregarded an imminent danger of sexual abuse in the Bartram home.  Moreover, in the absence of any evidence that anyone actually realized that abuse was likely taking place, plaintiffs cannot show that there was an obvious risk so great as to make it highly likely that abuse would result. *See Lanning ex rel. Lanning v. Anderson*, 22 Kan. App. 2d 474, 482, 921 P.2d 813, 820 (1996) (trial court erred in submitting a wantonness claim to the jury where there was no evidence that the defendants realized the imminence of danger and disregarded a known or obvious risk that was so great as to make it highly probably that harm could follow); *see also* Restatement (Second) of Torts § 500 (reckless disregard for safety requires conduct creating an unreasonable risk that is substantially greater than the risk required for negligence).

The Court concludes that no reasonable jury could conclude, based on this evidence, that TFI was guilty of anything more than ordinary negligence.  Accordingly, the Court grants TFI summary judgment on plaintiffs' claims of wanton conduct.  *See Rios v. Bigler*, 847 F. Supp. 1538, 1549 (D. Kan. 1994) (granting summary judgment on wantonness claim where court could not find "that a reasonable view of plaintiff's evidence supports a finding that the [defendants'] conduct was anything more

reprehensible than negligence"), *aff'd*, 67 F.3d 1543 (10th Cir. 1995).

### C.    *Tort of Outrage*

TFI also seeks summary judgment on plaintiffs' outrage claim under Kansas law.

"Kansas has set a very high standard for the common law tort of intentional infliction of

emotional distress or, as it is sometimes referred to, the tort of outrage." *Holdren v.*

*General Motors Corp.*, 31 F. Supp. 2d 1279, 1282 (D. Kan. 1998).  Kansas has adopted

Restatement § 46(1)'s definition of this tort. *See Wiehe v. Kukal*, 225 Kan. 478, 480-81,

592 P.2d 860, 862 (1979) (quoting *Dawson v. Associates Fin. Servs.*, 215 Kan. 814, 822,

529 P.2d 104, 111 (1974)).  Section 46(1) of the Restatement provides as follows:

> One who by extreme and outrageous conduct intentionally or recklessly
> causes severe emotional distress to another is subject to liability for such
> emotional distress, and if bodily harm to the other results from it, for such
> bodily harm.

Restatement (Second) of Torts § 46(1).  In a comment, the Restatement expounds on the

element of extreme and outrageous conduct:

> The cases thus far decided have found liability only where the defendant's
> conduct has been extreme and outrageous.  It has not been enough that the
> defendant has acted with an intent which is tortious or even criminal, or
> that he has intended to inflict emotional distress, or even that his conduct
> has been characterized by "malice," or a degree of aggravation which
> would entitle the plaintiff to punitive damages for another tort.  Liability
> has been found only where the conduct has been so outrageous in
> character, and so extreme in degree, as to go beyond all possible bounds
> of decency, and to be regarded as atrocious, and utterly intolerable in a
> civilized community.  Generally, the case is one in which the recitation of
> the facts to an average member of the community would arouse his
> resentment against the actor, and lead him to exclaim, "Outrageous!"
>
> The liability clearly does not extend to mere insults, indignities,

44

> threats, annoyances, petty oppressions, or other trivialities. The rough
> edges of our society are still in need of a good deal of filing down, and in
> the meantime plaintiffs must necessarily be expected and required to be
> hardened to a certain amount of rough language, and to occasional acts
> that are definitely inconsiderate and unkind. There is no occasion for the
> law to intervene in every case where someone's feelings are hurt. There
> must still be freedom to express an unflattering opinion, and some safety
> valve must be left through which irascible tempers may blow off relatively
> harmless steam.

*Id.* cmt. d (quoted in *Wiehe*, 225 Kan. at 482, 592 P.2d at 863).

In support of their outrage claims, plaintiffs essentially rely on the same evidence that they cited to support their wantonness claims. For essentially the same reasons, the Court concludes that such evidence is insufficient to support an outrage claim in this case as a matter of law. First, as the Court previously concluded, the evidence is not sufficient to show that TFI intentionally or recklessly caused plaintiffs harm. Second, plaintiffs' facts have not shown that TFI's allegedly negligent conduct in failing to recognize a risk of abuse was sufficiently extreme and outrageous. Again, evidence that TFI actually knew of a particular danger of sexual abuse and nonetheless placed plaintiffs in the Bartram home might support this cause of action, but no such evidence has been submitted here. Nor have plaintiffs identified any authority or caselaw suggesting that the mere failure to protect someone from harm by a third party—and without evidence of knowledge that the third party was an abuser—may be considered extreme and outrageous under Kansas law.

The Court concludes that plaintiffs have failed to provide sufficient evidence to support their outrage claims, and it therefore grants TFI summary judgment on those

claims.

D.    *Claims for Punitive Damages*

TFI seeks summary judgment on plaintiffs' claims for punitive damages based on its argument that such damages are unavailable to plaintiffs without their claims of wanton conduct and outrage. Plaintiffs have not opposed this argument or identified any additional basis for punitive damages in this case. Therefore, the Court awards TFI summary judgment also on plaintiffs' punitive damage claims.

## X.    Negligence Issues (Doc. # 286)

In its fifth motion for summary judgment, in conjunction with its motion to exclude expert testimony, *see supra* Part III, TFI raises various issues concerning plaintiffs' negligence claims. The Court rejects each of these arguments for summary judgment.

First, TFI argues, with little discussion, that there is no causation here as a matter law, in light of the admission by Dr. Logan, plaintiffs' expert, that he offers no expert opinions concerning causation. The Court rejects this basis for summary judgment. Under Kansas law, medical expert testimony is often required, but only with respect to those matters clearly within the domain of medical science; expert testimony is not required regarding matters within a jury's common knowledge. *See Webb v. Lungstrum*, 223 Kan. 487, 490, 575 P.2d 22, 25 (1978); *see also Perkins v. Susan B. Allen Mem. Hosp.*, 36 Kan. App. 2d 885, 889, 893, 146 P.3d 1102, 1106, 1108 (2006) (expert

testimony not necessarily required for negligence other than medical malpractice if specialized medical knowledge is not required).  In this case, there may be subjects on which expert testimony will be required.  In arguing that there is no causation here, however, TFI does not distinguish between the various types of damages sought by plaintiffs.

The Court concludes with respect to at least some of plaintiffs' damage claims, expert testimony would not necessarily be required for proof of causation.  For instance, plaintiffs seek damages for pain and suffering from the alleged sexual abuse.  If plaintiffs prove that such abuse occurred and that TFI was negligent in placing or maintaining them in the situation that facilitated that abuse, a jury could reasonably infer that the negligence did cause some damage without the aid of expert medical testimony.  Thus, the Court cannot say that plaintiffs' negligence claim as a whole fails as a matter of law for lack of an expert witness concerning causation.

Moreover, even if expert testimony were required, TFI's own expert opined in his report that plaintiffs were adversely affected and damaged by abuse occurring both before and during their foster care.  Such testimony would provide medical evidence of a causative link between the alleged abuse and plaintiffs' injuries.[16]

At trial, plaintiffs may be unable to prove entitlement to some particular damages,

---

[16]TFI argues that it will not call its own damages expert, Dr. Lubbers, at trial if Dr. Logan is excluded.  The Court need not decide at this time, however, the extent to which plaintiffs might be able to use their deposition of Dr. Lubbers at trial.

such as future costs for certain treatments, in light of Dr. Logan failure to provide a causation opinion. The Court cannot say at this time, however, that there is no evidence of causation here as a matter of law. Accordingly, the Court denies TFI's motion for summary judgment on this basis.

Second, TFI argues that plaintiffs failed to plead sufficient facts in their complaint to support the breach by TFI of its standard of care. The Court need not analyze the allegations of the complaint at this time, as the pretrial order now governs plaintiffs' claims. In the pretrial order, plaintiffs allege a number of facts supporting their claim of a breach by TFI. The addition of facts that were not alleged in the complaint does not constitute the impermissible addition of a new claim in the pretrial order. TFI is not entitled to summary judgment on this basis.

Third, TFI argues that if the Court strikes Dr. Crenshaw's testimony, it is entitled to summary judgment because plaintiffs will then have no expert on the standard of care. The Court need not decide whether such an expert is required here. The Court did not strike Dr. Crenshaw's testimony, *see supra* Part III.A; therefore, TFI is not entitled to summary judgment on this basis.

Fourth, TFI argues that it is entitled to partial summary judgment relating to certain opinions by Dr. Crenshaw, based on TFI's argument that such testimony is irrelevant in light of plaintiffs' release of TFI for claims based on Wyandot Center's own liability. The Court has already rejected this argument by TFI and concluded that this expert testimony may be relevant, *see supra* Part III.A; accordingly, the Court denies

summary judgment on this basis.

Fifth, TFI argues that if the Court strikes Dr. Logan's testimony, it is entitled to summary judgment on plaintiffs' damage claims because plaintiffs will have no damages expert. Again, the Court need not decide at this time which components of plaintiffs' damage claims require expert testimony. The Court did not strike Dr. Logan's testimony, *see supra* Part III.B; therefore, the Court denies TFI summary judgment on this basis.

The Court denies TFI's fifth motion for summary judgment in its entirety.

## XI.   **Damages (Doc. # 288)**

Finally, in its sixth motion for summary judgment, TFI makes various arguments relating to plaintiffs' damage claims. First, TFI argues that plaintiffs' claims are limited by the caps and prohibitions on damages imposed by K.S.A. § 75-6105 ($500,000 cap on total damages for claims within the scope of the Kansas Tort Claims Act, no punitive damages against governmental entities, punitives against governmental employees only upon a showing of fraud or malice); K.S.A. § 60-19a02 ($250,000 cap on noneconomic damages in personal injury actions); and K.S.A. § 60-3702(e)(2) ($5,000,000 cap on punitive damages). TFI has not explained why these caps should be applied at this stage of the litigation, however. The Court believes that the consideration of any caps on damages is better left for post-trial proceedings in the event of a verdict. Accordingly, this basis for summary judgment is denied.

49

TFI also seeks summary judgment on plaintiffs' claims for pain and suffering and for punitive damages on the basis of a lack of expert testimony supporting such claims. TFI has not shown that such expert testimony is required, however. *See supra* Part X. Summary judgment is denied on this basis.

Finally, TFI seeks summary judgment on plaintiffs' claims to recover their costs for treatments after they reach the age of 18. TFI argues that expert testimony is necessary to support such claims and that because Dr. Logan's testimony should be excluded, plaintiffs' claims must fail. Because the Court denied TFI's motion to exclude Dr. Logan's testimony, *see supra* Part III.B, it also rejects this argument for summary judgment.

TFI also argues that Dr. Logan's opinions concerning the need for treatment after the age of 18 are too speculative, based on a lack of language evidencing opinions made to a reasonable degree of medical certainty. The Court rejects this argument as well. Dr. Logan stated in his report and testified that such treatment is likely, and as explained above, the expert need only speak in terms of probability. *See supra* Part III.B. Again, the Court will await Dr. Logan's actual testimony at trial to judge its compliance with this standard. Moreover, the Court notes that TFI's own expert, Dr. Lubbers, also opined that plaintiffs would need money for therapy after age 18, thereby providing additional evidence to support this claim for damages. The Court denies TFI's sixth motion for summary judgment.

\*       \*       \*

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiffs' motion to exclude expert testimony (Doc. #273) is **granted in part and denied in part**.  The motion is granted with respect to expert testimony by Scott Fraser; the motion is denied with respect to expert testimony by Daniel Marble.

IT IS FURTHER ORDERED THAT defendant TFI's motion to exclude expert testimony (Doc. # 284) is **denied**.

IT IS FURTHER ORDERED THAT defendant TFI's motions to strike certain factual statements by plaintiffs (Doc. ## 350, 354) are **denied**.

IT IS FURTHER ORDERED THAT defendant TFI's first motion for summary judgment, relating to qualified immunity under the public function doctrine (Doc. # 269), is **denied**.

IT IS FURTHER ORDERED THAT defendant TFI's second motion for summary judgment, relating to immunity under the Kansas Tort Claims Act (Doc. # 271), is **denied**.

IT IS FURTHER ORDERED THAT defendant TFI's third motion for summary judgment, relating to the issue of foreseeability (Doc. # 279), is **denied**.

IT IS FURTHER ORDERED THAT defendant TFI's fourth motion for summary judgment, relating to plaintiffs' claims of wanton conduct and outrage and their claims for punitive damages (Doc. # 282), is **granted**, and judgment is awarded in favor of TFI

on those claims.

IT IS FURTHER ORDERED THAT defendant TFI's fifth motion for summary judgment, relating to plaintiffs' negligence claims (Doc. # 286), is **denied**.

IT IS FURTHER ORDERED THAT defendant TFI's sixth motion for summary judgment, relating to damages (Doc. # 288), is **denied**.

IT IS SO ORDERED.

Dated this 8th day of September, 2009, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge